[Cite as *State v. Tribble*, 2011-Ohio-3618.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                                    :
                                                 :       Appellate Case No. 24231
            Plaintiff-Appellee                   :
                                                 :       Trial Court Case No. 2010-CR-597
v.                                               :
                                                 :
BENNIE LEE TRIBBLE, JR.          :       (Criminal Appeal from
                                                 :           Common Pleas Court)
            Defendant-Appellant         :
                                                 :
                                 . . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of July, 2011.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O.
Box 972, 301 West Third Street, Dayton, Ohio 45422
            Attorney for Plaintiff-Appellee

DANIEL R. ALLNUTT, Atty. Reg. #0085452, Post Office Box 234, Alpha, Ohio 45301
            Attorney for Defendant-Appellant

. . . . . . . . . . . .

RICE, J., sitting by assignment.

{¶ 1}   Appellant, Bennie Lee Tribble, Jr., appeals his conviction by the Montgomery

County Court of Common Pleas, following a bench trial, of felonious assault.  At issue is

whether the court's finding of guilt was against the manifest weight of the evidence.  For the

reasons that follow, we affirm.

{¶ 2} On March 23, 2010, appellant was indicted for felonious assault with a deadly weapon, to-wit: a boxcutter, a felony of the second degree, in violation of R.C. 2903.11(A)(2). Appellant pled not guilty and waived his right to jury trial. The case proceeded to bench trial on June 28, 2010.

{¶ 3} Matt Leaman testified he is employed as a bouncer at the Yellow Rose night club in West Carrollton, Ohio, and was on duty on Saturday night, February 27, 2010, near midnight. At that time he saw a male, later identified as appellant, and a female involved in an altercation. When Mr. Leaman saw appellant grab the female's hair, Mr. Leaman started making his way toward them. However, before reaching them, the female's husband intervened. The husband grabbed appellant by his shirt and was yelling at him.

{¶ 4} Mr. Leaman testified that he and Shawn Parah, another bouncer, approached the three patrons involved in the altercation, and separated appellant from the couple. Mr. Leaman told the husband to calm down and walk away, and he complied. However, appellant remained combative and aggressive. Mr. Leaman told him he had to leave, but appellant refused. Mr. Parah then grabbed appellant by his arms and said, "Let's go to the door." Appellant started to struggle with him. As a result, Mr. Leaman and another bouncer each grabbed one of appellant's arms and the three bouncers walked appellant to the door.

{¶ 5} Mr. Leaman testified that, just outside the door, they released appellant. He then turned around and threw a punch at Mr. Leaman. However, he ducked and the punch struck Mr. Parah, who was behind him.

{¶ 6} At that point a fourth bouncer, Ben Wentzel, arrived to provide assistance. The four bouncers then tackled appellant and took him to the ground a few feet past the

doorway in an effort to stop appellant from throwing any more punches. Mr. Leaman and the other bouncers then formed a human wall covering the front door to prevent appellant from re-entering the night club.

{¶ 7} After appellant got up, Mr. Leaman said, "Leave. Just go. * * * This is over." However, appellant refused and, instead, threw a few more punches at him. Appellant called Mr. Leaman a "soft-ass white boy," and bragged that "he hangs with country, Georgian niggas."

{¶ 8} Mr. Leaman testified that appellant threw a few more punches at him without hitting him, and then he threw one jab at appellant, which made him more angry. When appellant was about 10 feet from the bouncers, he reached into his pocket and pulled out a metal object with his right hand that Mr. Leaman recognized as a boxcutter, which is a utility knife used to tear open boxes. Appellant passed it to his left hand and then extended the blade. Mr. Leaman took a few steps back, and appellant advanced toward him. Appellant slashed the boxcutter at Mr. Leaman three or four times with his left hand and then struck Mr. Leaman in the cheek with his right hand when he was about two feet from him.

{¶ 9} Mr. Leaman testified that Mr. Parah reported the incident to the West Carrollton Police Department. Mr. Parah told the bouncers that the dispatcher had advised him to keep a safe distance from appellant, but to make sure he did not get away until the police arrived. Shortly thereafter, Mr. Leaman heard police sirens and appellant began to run across the parking lot. The bouncers followed appellant until the responding officer arrived and eventually arrested him.

{¶ 10} Mr. Parah testified that when he saw a physical confrontation between appellant and another male, he approached appellant, put his hand on the back of his elbow, and said he needed to calm down. Appellant swatted his hand away, and said, "Get your fucking hands off me, white boy." Mr. Parah then grabbed his arms, put them behind his back, and turned him around to lead him to the front door. However, appellant tried to pull his arms away, and Mr. Leaman and another bouncer approached and helped Mr. Parah escort appellant to the front door.

{¶ 11} Just outside the front door, Mr. Parah released appellant and he swung and hit Mr. Parah in his face. Some of the bouncers pushed appellant to the ground. He then got up and, while clenching his fists, said, "That's right, I got fast hands, bitch."

{¶ 12} The bouncers formed a straight line to keep appellant out of the bar. Appellant remained agitated and aggressive toward Mr. Leaman. The bouncers told appellant to leave, to get in his car and go home, but he refused.

{¶ 13} Appellant confronted Mr. Leaman and threw a few punches at him. Appellant then produced a knife and, with its blade exposed, made cutting motions at Mr. Leaman's face and threatened to slash his throat with it. Mr. Parah said that at the time, appellant was about four feet from Mr. Leaman.

{¶ 14} Mr. Parah testified that while appellant was slashing his knife at Mr. Leaman, he called the police to report the incident. When the responding officer arrived, Mr. Parah told him that appellant still had the knife in his hand.

{¶ 15} Another bouncer, Ben Wentzel, testified that once appellant was taken outside, he took a punch at one of the bouncers and was yelling he has quick hands. The bouncers

told appellant to leave many times, but he refused and kept coming back at them. Appellant took a few swings at Mr. Leaman, who then took one swing at appellant. Appellant backed up and pulled a knife out of his pocket. Mr. Wentzel said that appellant was three feet from Mr. Leaman when he was making slashing gestures at him.

{¶ 16} Sergeant Kori Rolando of the West Carrollton Police Department testified that he was dispatched on a call of a male with a knife. As Sergeant Rolando pulled in the parking lot, he saw a male matching the suspect's description with several bouncers and patrons following him.

{¶ 17} Sergeant Rolando testified that after he exited his cruiser, appellant was walking toward him holding a boxcutter. The sergeant pointed his gun at him and told appellant to drop the knife and back up, but appellant refused and kept walking toward him holding the boxcutter. Sergeant Rolando was able to lead appellant to the back of his cruiser, but appellant refused to put down his knife. The sergeant placed appellant against the trunk of his cruiser, trying to control his wrist. Sergeant Rolando grabbed appellant's left arm and struck his right forearm in order to get appellant to release his boxcutter, which he eventually did.

{¶ 18} Sergeant Rolando testified that he tried to put appellant in handcuffs, but he resisted. The sergeant struggled with him to get his hands behind his back, and he eventually handcuffed him. Appellant was then transported to the police station. During an interview with police, when asked if he used the knife in an aggressive manner toward anyone, appellant said, "Hell, yes. I did. What would you do?"

{¶ 19} After the state rested, Dan Levalley testified for the defense. He said that he

went to the bar that night with appellant. He saw appellant arguing with a female in the bar and then saw the bouncers remove appellant from the bar. Later, he went outside and saw the bouncers surrounding appellant and the police arriving. Mr. Levalley said he did not see any of the bouncers hit appellant. Moreover, he saw no bruises, blood, or injuries on appellant.

{¶ 20} Appellant testified that for no reason, four bouncers grabbed and choked him and dragged him outside. He denied taking a swing at or hitting Mr. Leaman, and denied calling him any names. He said the bouncers threw him to the ground. He said they punched and kicked him, but he got loose and walked away. He said ten bouncers then came after him and he pulled out his knife to back them off of him, but he said he never extended the blade and did not swing it at anyone. He said he never used the knife to try to harm any of the bouncers and never advanced toward them with it. He testified, "I didn't use the knife in self-defense." According to appellant, after he pulled out his knife, he merely said, "Hey, you all, I don't respect you for the fact that - - how you all did me." Appellant admitted that he did not comply with Sergeant Rolando's initial instruction to back up. He said that after he threw his knife on the back of the cruiser, "the officer * * * started roughing [him] up, too" by picking him up and slamming him against the cruiser.

{¶ 21} Following the trial, the court took the matter under advisement, and on July 2, 2011, entered its verdict of guilty of felonious assault with a deadly weapon. The court entered a written verdict of guilt in which it found that appellant failed to meet his burden of proving self-defense. Specifically, the court found that, although appellant had an honest belief that he was in immediate danger of death or great bodily harm, appellant was not blameless in creating the situation giving rise to the incident. Further, the court found that,

although appellant had a reasonable means of escape from the danger other than by the use of force, rather than retreat, appellant brandished a boxcutter with its blade extended and made swiping or cutting motions with the boxcutter, and advanced menacingly toward Mr. Leaman while displaying the boxcutter, thus knowingly attempting to cause physical harm to Mr. Leaman with it. The court also found that, while brandishing the boxcutter, appellant came close enough to Mr. Leaman to punch him with his free hand.

{¶ 22} On July 29, 2010, the trial court sentenced appellant to community control sanctions not to exceed five years.

{¶ 23} Appellant appeals his conviction, asserting two assignments of error. For his first assigned error, he contends:

{¶ 24} "THE APPELLANT'S FELONIOUS ASSAULT CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE APPELLANT'S SELF DEFENSE CLAIM WAS VALID."

{¶ 25} Appellant does not challenge the sufficiency of the evidence to support his conviction of felonious assault. Instead, he argues the court's finding that he failed to prove self-defense was against the manifest weight of the evidence.

{¶ 26} Although a conviction may be sustained as having been based on sufficient evidence, "a court of appeals may * * * nevertheless conclude that [the] judgment is against the weight of the evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52.

{¶ 27} There is a fundamental distinction between a challenge to the sufficiency of the evidence and a challenge to the weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different from

each other. Id. at 386. An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence most favorably to the state, the jury could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 273.

{¶ 28} In contrast, the weight of the evidence concerns the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other. *Thompkins*, supra, at 387. If, on weighing the evidence, the trier of fact finds the greater amount of credible evidence sustains the issue that a party seeks to establish, that party will be entitled to its verdict. Id. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis omitted.) Id., quoting Black's Law Dictionary (6 Ed.Rev.1990), 1594.

{¶ 29} In determining whether the judgment is against the manifest weight of the evidence, the appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, supra, at 387. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175; see, also, *State v. Rowland*, Montgomery App. No. 20625, 2005-Ohio-3756, at ¶5.

{¶ 30} The role of the appellate court is to engage in a limited weighing of the

evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. *Thompkins*, supra, at 390 (Cook, J., concurring). The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Because the trier of fact had the opportunity to see and hear the witnesses, the appellate court is required to give substantial deference to the factfinder's determinations of credibility. Thus, the decision whether, and to what extent, to believe the testimony of each witness is within the province of the factfinder. *State v. Key*, Montgomery App. No. 22609, 2009-Ohio-422, at ¶25. "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." Id. at ¶26.

{¶ 31} Appellant was found guilty of felonious assault with a deadly weapon, in violation of R.C. 2903.11, which provides:

{¶ 32} "(A) No person shall knowingly * * *

{¶ 33} "* * *

{¶ 34} "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."

{¶ 35} Appellant argues the trial court erred in finding he failed to meet his burden to prove self-defense. Self-defense is an affirmative defense, which the defendant has the burden to prove by a preponderance of the evidence. R.C. 2901.05(A); *State v. Jackson* (1986), 22 Ohio St.3d 281, 283.

{¶ 36} In order to establish self-defense through the use of deadly force, "a defendant

must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio-68, citing *State v. Robbins* (1979), 58 Ohio St.2d 74. "[T]he elements of self-defense are cumulative. * * * If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis omitted.) *Jackson*, supra, at 284.

{¶ 37} This Court in *State v. Kucharski*, Montgomery App. No. 20815, 2005-Ohio-6541, at ¶19-21, explained the duty to retreat, as follows:

{¶ 38} "Deadly force may [be] used as a defense against a danger of death or great bodily harm, but when deadly force is used the defendant must * * * not have violated any duty to retreat in order to protect himself from that danger. *Robbins*[, supra]. Implicit in the retreat requirement is a value judgment that retreat is preferred to a loss of life resulting from the use of deadly force.

{¶ 39} "The duty to retreat does not apply when one is attacked in one's home or office. *Jackson*[, supra]. It otherwise generally does when deadly force is used, and to prove that the duty was not violated the defendant must show that *no means of retreat or avoidance was available, that his only means of escape or avoidance was the deadly force he used. State v. Melchior* (1978), 56 Ohio St.2d 15.

{¶ 40} "Because the use of nondeadly force, by definition, presents no risk of loss of

life, there is no duty to retreat when nondeadly force is used in self-defense. * * *" (Emphasis added.)

{¶ 41} First, appellant argues the trial court's finding that he violated his duty to retreat was not supported by the record. We do not agree. Citing isolated statements of Mr. Wentzel, one of the bouncers, appellant argues he attempted to retreat twice. However, the testimony of Mr. Leaman and Mr. Parah supports the trial court's finding.

{¶ 42} Mr. Leaman and Mr. Parah testified that once the bouncers took appellant outside, they released him. However, instead of retreating, appellant turned around and threw a punch at Mr. Leaman, missing him, but striking Mr. Parah in the face. Mr. Leaman and Mr. Parah also testified that after they told appellant to "[l]eave," "[j]ust go," "[t]his is over," and to "get in your vehicle, go home," instead of retreating, appellant threw more punches at Mr. Leaman, calling him a "soft-ass white boy" and bragging that he "hangs with country, Georgian niggas."

{¶ 43} Still failing to retreat, appellant threw more punches at Mr. Leaman, until he threw one jab at appellant, which made appellant more angry. At that point, appellant was at least ten feet away from the bouncers, and he therefore had another opportunity to retreat. Instead, he reached into his pocket and pulled out his knife.

{¶ 44} Appellant argues that his witnesses testified that, while escorting appellant out of the bar, one of the bouncers put his arm around his neck in a chokehold. However, the bouncers denied ever doing so. In any event, the argument is irrelevant because that alleged incident occurred inside the bar prior to the bouncers escorting appellant outside and prior to giving him multiple opportunities to retreat.

{¶ 45} Next, appellant argues the trial court erred in finding that he was at fault in creating the situation giving rise to the affray.  Again, we do not agree.  Both Mr. Leaman and Mr. Parah testified that after they removed appellant from the bar and released him outside, he threw the first punch attempting to strike Mr. Leaman, but hitting Mr. Parah instead.  Further, despite the bouncers' instructions to appellant to leave, he threw more punches at Mr. Leaman and taunted him by calling him derogatory names.  Then, while threatening Mr. Leaman with his knife, he struck him in the cheek with his free hand.

{¶ 46} Finally, appellant's trial testimony defeated his argument that he acted in self-defense.  The Supreme Court of Ohio in *State v. Poole* (1973), 33 Ohio St.2d 18, 19, characterized the defense of self-defense as a "justification for admitted conduct."  The court in *Poole* stated that this defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances, which the defendant claims exempt him from liability. Id.  Thus, self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged.  However, appellant testified at trial, as follows:

{¶ 47} "Q. * * *  What was your point in displaying the knife?

{¶ 48} "A. Just to back them off of me, to scare them away from me.  * * *

{¶ 49} "Q. * * *  Did you ever use [the knife] in a manner where you attempted to cause physical harm?

{¶ 50} "Q. No, sir.  I didn't.

{¶ 51} "* * *

{¶ 52} "Q. So at what point did you use the knife in self-defense?

{¶ 53} "A. I didn't use the knife in self-defense.  I told you, they beat me.  When

they took me out of the club, they slammed me down on the ground. They punched and kicked on me. I got up. I don't even know how I got up. I started walking away. I mean, I was walking away from them.

**{¶ 54}** "And I looked back. * * * [I]t was about 10 guys in a circle coming towards me. I pulled my knife out. I said, 'I don't respect this way that you all did me.' I never opened the blade or anything. * * *"

**{¶ 55}** Thus, at trial, appellant denied extending the blade on his knife or using it to try to harm Mr. Leaman. However, on appeal, appellant argues there were independent facts or circumstances that exempted him from liability because the bouncers allegedly pursued him in the parking lot. Consequently, he cannot assert self-defense because that defense requires the admission by the defendant of the essential facts alleged by the prosecution. *Poole*, supra. To maintain both positions is "logically and legally inconsistent," because "[a]ppellant cannot claim absolute innocence and simultaneously avail himself of an affirmative defense" of self-defense. *State v. Powell* (Sept. 29, 1997), 4th Dist. No. 96CA2257, 1997 Ohio App. LEXIS 4480, *11-*12. The court in *Powell* held: "It would be nonsensical to permit a criminal defendant to completely deny that he committed the act underlying the charge, yet also claim that his commission of the act was justified and that he should therefore be excused from criminal responsibility. Such a holding would allow a criminal defendant to have his cake and eat it too." Id. at *5. Accord: *Poole*, supra; *State v. Kajoshaj* (Aug. 10, 2000), 8th Dist. No. 76857; *State v. Perry*, 5th Dist. No. 02-CA-77, 2003-Ohio-6097, at ¶27; *State v. Wall* (Aug. 21, 1973), 10th Dist. No. 73AP-115, 1973.

**{¶ 56}** Because appellant denied committing the act alleged in the indictment, i.e., that

he attempted to cause physical harm to Mr. Leaman by means of a boxcutter, he is precluded from arguing on appeal that the trial court should have found he acted in self-defense.

{¶ 57} Appellant's first assignment of error is overruled.

{¶ 58} For his second assignment of error, appellant alleges:

{¶ 59} "THE APPELLANT'S CONVICTION MUST BE REVERSED AS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, BECAUSE NO PHYSICAL HARM WAS SUSTAINED BY THE DEADLY WEAPON INVOLVED, AND THE RECORD DOES NOT SUPPORT A FINDING THAT HE KNOWINGLY ATTEMPTED TO CAUSE PHYSICAL HARM."

{¶ 60} Appellant concedes the evidence was sufficient to support his conviction of felonious assault pursuant to *State v. Workman* (1992), 84 Ohio App.3d 537, motion for leave to appeal to the Supreme Court of Ohio overruled at (1993), 66 Ohio St.3d 1507. Instead, he presents another manifest-weight challenge. First, he argues that the record as a whole does not support the trial court's finding that he came close enough to Mr. Leaman with his knife to injure him with it. While appellant concedes that Mr. Leaman testified appellant struck him with his free hand while brandishing his knife with the other and therefore was close enough to stab him with it, he argues that Mr. Leaman's testimony during his preliminary hearing contradicted that testimony. However, appellant failed to file the transcript of that hearing on appeal. Consequently, it is impossible for us to determine whether Mr. Leaman's trial testimony contradicted his testimony at that earlier hearing. For this reason alone, the argument lacks merit. *Riad v. Riad* (June 2, 1987), Montgomery App. No. 10182, 1987 Ohio App. LEXIS 7346, *1-*2, citing *Schick v. Cincinnati* (1927), 116 Ohio St. 16, 25. In any

event, the alleged excerpt relied upon by appellant does not contradict Mr. Leaman's testimony. He merely conceded at the earlier hearing that while appellant was holding his knife, he did not actually touch him with it.

{¶ 61} Second, appellant argues that none of the bouncers testified he was within range to cause harm with his boxcutter. However, to the contrary, Mr. Leaman testified appellant was only two feet away from him when he pulled out his knife. Further, Mr. Parah testified that when appellant produced his knife and took a couple of swipes with it at Mr. Leaman's face, appellant was about four feet from Mr. Leaman. Moreover, Mr. Wentzel testified that appellant was three feet from Mr. Leaman when he made slashing gestures toward him with his knife.

{¶ 62} The trial court was in the best position to view the witnesses, determine their credibility, and resolve any conflicts in the testimony. In finding appellant guilty of felonious assault and finding he failed to prove self-defense, the trial court obviously chose to believe the state's witnesses and to discredit appellant's version of events. After thoroughly reviewing the record, we cannot say the trial court clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a reversal of his conviction and a new trial. We therefore hold that appellant's conviction was not against the manifest weight of the evidence.

{¶ 63} For the reasons stated in this opinion, the assignments of error are not well taken. It is the judgment and order of this Court that the judgment of the Montgomery County Court of Common Pleas is affirmed.

. . . . . . . . . . . . .

FROELICH and HALL, JJ., concur.

(Hon. Cynthia Westcott Rice, Eleventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
Daniel R. Allnutt
Hon. Mary L. Wiseman